Amy J. Oliver (8785)
olivera@sec.gov
Daniel J. Wadley (10358)
wadleyd@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel.  801-524-5796
Fax: 801-524-3558

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        PLAINTIFF,

v.

JERSEY CONSULTING LLC, a Nevada
limited liability company, MARC ANDREW
TAGER, an individual, MATTHEW EARL
MANGUM, an individual, SUZANNE
AILEEN GAGNIER, an individual, KENNETH
STEPHEN GROSS, an individual, JEFFREY
ROWLAND LEBARTON, an individual,
JONATHAN EDWARD SHOUCAIR, an
individual, EDWARD DEAN GOSS, an
individual, DANA KENTON HARRLOE, an
individual, and NICHOLI MANDRACKEN, an
individual,

        DEFENDANTS; and

PREMIER MARKETING SOLUTIONS, INC.,
a California corporation, EQUITY FIRST
PROPERTIES INC., a California corporation,
EEE MEDIA, INC., a California corporation,
XYZ LEADS, INC., a Wyoming corporation, U
TURN MARKETING, INC., a Florida
corporation, MATTHEW JACOB FREITAS, an
individual, ROXANE MARIE GROSS, an
individual, and CHRISTINE L. SHOUCAIR, an
individual,

        RELIEF DEFENDANTS.

Case No.: 2:18-cv-00155

Judge: Bruce S. Jenkins

**AMENDED COMPLAINT**

1

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Jersey Consulting LLC, Marc Andrew Tager, Matthew Earl Mangum, Suzanne Aileen Gagnier, Kenneth Stephen Gross, Jeffrey Rowland Lebarton, Jonathan Edward Shoucair, Edward Dean Goss, Dana Kenton Harrloe, and Nicholi Mandracken (collectively, the "defendants") alleges as follows:

## SUMMARY OF THE ACTION

1.   This case concerns an unregistered and fraudulent offering of securities by Jersey Consulting LLC and its principal, convicted felon Marc Andrew Tager, effected through the use of paid and unregistered solicitors. Since September 2014, Jersey and Tager, with the assistance of Mangum and the solicitors, raised at least $6 million from at least 84 investor households via the offer and sale of Jersey securities referred to as "Royalty Interests," and the conduct is believed to be ongoing.

2.   Jersey, Tager, Mangum, and solicitors Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrlow, and Mandracken (collectively, the "solicitors") represented to investors that:

(A)  Jersey had developed a unique and proprietary "soil remediation" and precious metals ore extraction process, referred to as plasmafication, that, supposedly, allowed Jersey to profitably extract precious metals from soil obtained from Jersey's 80-acre Bureau of Land Management ("BLM") claim located in or near the Arizona Strip and to do so at a rate that was in excess of current industry standards,

(B)  funds raised by Jersey through the offer and sale of Jersey "Royalty Interests" would be used "to fund [Jersey's] operations, increase soil remediation and refining activities, expand marketing and sales efforts, and provide working capital for overall corporate operations,

(C) Jersey's Royalty Interest securities were secure and protected because they were backed by Jersey's physical assets and current revenues, and

(D) they would "double" their money with a return of 100% or more in twelve months or less.

3.      Jersey, Tager, Mangum, and the solicitors misrepresented to investors and/or omitted to disclose to investors that, among other things, Jersey was owned and operated by a convicted felon (Tager), Jersey had no BLM claim, Jersey's technology was not commercially viable, Jersey had no material revenues, the value of Jersey's physical assets was insufficient to secure Jersey investors, Jersey funds were dissipated through personal use by Jersey principals Tager, Mangum, and Freitas, and some Jersey investors were repaid with funds raised from subsequent Jersey investors (*i.e.*, a Ponzi scheme).

4.      Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

5.      Among other relief, the defendants should be enjoined from future violations and ordered to disgorge, with prejudgment interest thereon, all ill-gotten gains obtained as a result of their violative conduct and to pay appropriate civil penalties.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and Section 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

7.      Defendants' conduct took place in connection with the offer, purchase, and/or sale of securities in the form of "fractional undivided interest[s] in oil, gas, or other mineral rights,"

and "certificate[s] of interest or participation in…any oil, gas, or other mineral royalty or lease" or, in the alternative, note and/or investment contract securities issued by Jersey [see 15 U.S.C § 77b(a)(1) and 15 U.S.C. § 78c(a)(10)].

8.      Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

9.      Pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], venue for this action is proper in the District of Utah because certain of the transactions, acts, practices, and/or courses of business alleged in this Complaint took place in this district and because certain of the defendants reside in and transact business in this district.

## **DEFENDANTS**

10.     **Jersey Consulting LLC** is a Nevada limited liability company organized on April 29, 2014, and which ostensibly engages in mining and/or ore processing activity. Jersey's principal place of business is in West Jordan, Utah. Jersey is owned and controlled by Tager.

11.     **Marc Andrew Tager**, 51, is the sole and managing member of Jersey and represents himself as Jersey's Managing Director. Tager resides in Sandy, Utah, with co-defendant Freitas. On September 29, 2005, Tager, who pled guilty to conspiracy to commit mail fraud [18 U.S.C. § 371 (18 U.S.C. § 1341)] in connection with a scheme to illegally duplicate and sell Microsoft software, was sentenced to serve 24 months in federal prison and two years' supervised release. Restitution to Microsoft was ordered in the amount of $1,131,019.00 and, as

of 2017, the vast majority of the ordered restitution was still unpaid. *U.S. v. Tager*, 3:04cr028-K (01) (N.D. Texas).

12.    **Matthew Earl Mangum**, 48, served variously as Jersey's "Chief Development Officer," "Chief Technology and Chief Operations Officer," and as a principal of Jersey. He resides in South Jordan, Utah.

13.    **Suzanne Aileen Gagnier**, 63, served as an independent contractor solicitor of Jersey securities. Gagnier is believed to reside in Huntington Beach, California.

14.    **Kenneth Stephen Gross**, 72, served as an independent contractor solicitor of Jersey securities. Gross is believed to reside in Northridge, California. On March 17, 2014, in connection with a Commission injunctive action filed in U.S. District Court for the Central District of California-Western Division (case no. 13-CV-04464-RGK (JCG)), a final judgment was entered by consent against Gross permanently enjoining him from future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C §§ 77e(a) and 77e(c)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]. *SEC v. Robert Hurd, et al.*, 2:13cv04464 (C.D.Cal.). Subsequently, the Commission, pursuant to Section 15(b)(6) of the Exchange Act [15 U.S.C. § 78o(b)(6)], made Gross the subject of a bar from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical ratings organization and from participating in an offering of penny stock. *See* SEC Admin. Rel. No. 34-72345 (June 6, 2014).

15.    **Jeffrey Rowland Lebarton** (aka Jeffrey Labarton), 67, served as an independent contractor solicitor of Jersey securities. Lebarton is believed to reside in Santa Monica, California.

16.    **Jonathan Edward Shoucair**, 65, served as an independent contractor solicitor of Jersey securities. Shoucair is believed to reside in North Hills, California. On April 2, 1998, in

connection with a Commission injunctive action filed in U.S. District Court for the Central District of California (case no. 2:97cv4811), a final judgment was entered by consent against Shoucair permanently enjoining him from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C §§ 77e(a), 77e(c), and 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]. *SEC v. B.M.C. Enterprises, Inc., et al.*, 2:97cv4811 (C.D.Cal.). On September 1, 2005, Shoucair, who pled guilty to charges of conspiracy to commit wire fraud, mail fraud, securities fraud & conspiracy to defraud agencies of the U.S. [18 U.S.C. § 371], wire fraud and aiding and abetting [18 U.S.C. §§ 1343 and 1342], mail fraud and aiding and abetting [18 U.S.C. §§1341 and 1342], and conspiracy to commit money laundering [18 U.S.C. 1956(h)] arising from the same nucleus of conduct underlying the Commission's injunctive action, was sentenced to, among other things, serve 63 months in federal prison and three years' supervised release and to pay $42,463,291 in restitution. *U.S. v. Shoucair*, 3:01cr01415 (S.D. Cal.). On July 16, 2003, Shoucair pled guilty to evasion of individual income taxes [26 U.S.C. § 7201] and was sentenced to 24 months in federal prison to run concurrent with his other fraud offenses. *U.S. v. Shoucair*, 3:03cr1950 (S.D. Cal.).

17.    **Edward Dean Goss**, 74, served as an independent contractor solicitor of Jersey securities. Goss is believed to  reside in California.

18.    **Dana Kenton Harrloe**, 61, served as an independent contractor solicitor of Jersey securities. Harrloe is believed to reside in California.

19.    **Nicholi Mandracken**, 70, served as an independent contractor solicitor of Jersey securities. Mandracken is believed to reside in Florida.

## RELIEF DEFENDANTS

20.    **Premier Marketing Solutions, Inc.** is a California corporation incorporated on

March 2, 2006, and believed to maintain its principal place of business in or around Huntington Beach, California. Premier is believed to be owned and controlled by Gagnier and used by her to receive at least $589,267.50 in commission payments on her behalf from Jersey. Most or all of this money came from investor funds paid to Jersey.

21.     **Equity First Properties Inc.** is a California corporation incorporated on January 3, 2012, and believed to maintain its principal place of business in or around Santa Monica, California. Equity First is believed to be owned and controlled by Lebarton and used by him to receive at least $600,750 in commission payments on his behalf from Jersey. Most or all of this money came from investor funds paid to Jersey.

22.     **Eee Media, Inc.** is a California corporation incorporated on July 17, 2003, and believed to maintain its principal place of business in Glendale, California. Eee Media, Inc. is believed to be owned and controlled by Edward Dean Goss and used by him to receive at least $10,000.00 in commission payments on his behalf from Jersey. Most or all of this money came from investor funds paid to Jersey.

23.     **XYZ Leads, Inc.** is a Wyoming corporation incorporated on December 16, 2011, and believed to maintain its principal place of business in Cheyenne, Wyoming. XYZ Leads, Inc. is believed to be owned and controlled by Dana Kenton Harrloe and used by her to receive at least $96,150.00 in commission payments on her behalf from Jersey. Most or all of this money came from investor funds paid to Jersey.

24.     **U Turn Marketing, Inc.** is a Florida corporation incorporated on February 13, 2013, and believed to maintain its principal place of business in Longwood, Florida. U Turn Marketing, Inc. is believed to be owned and controlled by Nicholi Mandracken and used by him to receive at least $130,616.60 in commission payments on his behalf from Jersey. Most or all of this money came from investor funds paid to Jersey.

25.     **Matthew Jacob Freitas**, 27, served as Jersey's "Procurement Officer" and "Night Crew Assistant." Freitas is married to Tager's ex-spouse and resides in Sandy, Utah. Freitas possessed signing authority on some of Jersey's bank accounts and expended and/or received, directly or indirectly, funds belonging to Jersey and obtained from investors on personal expenses.

26.     **Roxane Marie Gross**, 67, is the spouse of Kenneth Gross and is believed to reside with him in Northridge, California. At least $127,937 in commission payments due Kenneth by Jersey were paid to a joint account he shared with Roxane. Most or all of this money came from investor funds paid to Jersey.

27.     **Christine L. Shoucair**, 65, is the spouse of Jonathan Shoucair and is believed to reside with him in North Hills, California. At least $326,250 in commission payments due Jonathan by Jersey were paid to one or more accounts in the name of Christine. Most or all of this money came from investor funds paid to Jersey.

## STATEMENT OF FACTS

### Background

28.     Jersey, owned and operated by Tager, claims to be a company engaged in the processing of mineral rich ore to extract, via Jersey's allegedly proprietary and "green" methods, precious metals for subsequent sale.

29.     Jersey and Tager, to raise capital for the business, offered financial instruments referred to as Royalty Interests that are securities under the federal securities laws.

30.     Tager and Jersey sought investors for Jersey's Royalty Interest securities, which promised investors a 100% or greater return in 12 months or less, through telemarketing calls placed by paid solicitors (*i.e.*, brokers) who were neither registered with the Commission as brokers nor associated with entities that were registered with the Commission as brokers.

31.     Two of these solicitors, K. Gross and J. Shoucair, were, as explained above, then subjects of injunctions against engaging in such conduct while K. Gross was then also the subject of a Commission bar against, among other things, acting as a broker.

32.     In connection with the offer and sale of Jersey securities, Jersey and Tager engaged in the making of multiple written misrepresentations and omissions in Jersey documents and on Jersey's public website.

33.     At least some of these written misrepresentations and omissions were then disseminated by the solicitors to investors and potential investors to induce them to purchase Jersey securities.

34.     In connection with the offer and sale of Jersey securities, Mangum made multiple oral misrepresentations and omissions to investors and potential investors to induce them to purchase Jersey securities.

35.     In addition to engaging in misrepresentations and omissions, Jersey, Tager and Mangum also employed devices, schemes, or artifices to defraud and engaged in practices which operated as a fraud on Jersey investors.

### Misrepresentations and Omissions

36.     The written misrepresentations and omissions that were provided to investors appeared in, among other places, Jersey's Executive Summary documents, Jersey's Royalty Interest documents, and Jersey's public website and concerned, among other things, the ability of Jersey to repay investors, the safety and security of Jersey securities, the use of investor funds, interest in Jersey by other large industry participants, the experience and qualifications of Jersey staff, and the existence of Jersey's mining claim.

### The Jersey Executive Summary

37.     Jersey and Tager produced at least three different versions of an "Executive

Summary" document, at least one version of which is known to have been provided to at least some investors in connection with the offering of Jersey's Royalty Interest securities.

38.    This document contains a number of misrepresentations and omissions, including that:

(A) Jersey had an 80-acre mining claim in the area of the Arizona Strip whereas no such claim belonging to Jersey has been found to exist,

(B) that investors would be repaid in 12 months or less whereas Jersey had no material revenues, customers, or products from which funds would be generated to repay investors with,

(C) that Jersey had received "overtures from large institutions to take a commanding role in our project" whereas no known evidence exists supporting this,

(D) that Jersey's "team" is "world class" whereas, in reality, Jersey's Chief Technology and Chief Operations Officer, Mangum, is a high school dropout who obtained a GED, graduated from a trade school program in electronics, and became an amateur miner and metallurgist, and Jersey's onetime Chief Scientific Officer possesses degrees in accounting and law, and

(E) that Tager "is a true entrepreneur with a stellar track record of 25 years in the corporate finance world whereas, in reality, Tager is a convicted felon.

39.    The Executive Summary document also states that investor funds, which accounted for the vast majority of funds that ever came within Jersey's control, would be used in connection with Jersey's stated business whereas they were, in material part, dissipated on personal expenditures by or for the benefit of Tager, Mangum, and/or Freitas.

40.    Bank records also suggest that Tager allowed others, including Mangum, to use debit cards associated with Jersey accounts and that Tager and Freitas provided signed blank

Jersey checks to others for non-Jersey usage.

41.     Some categories and examples of improper transactions made with funds in the Jersey accounts include payments for:

(A)   a Harley-Davidson motorcycle and other vehicles and vehicle services and accessories (*e.g.*, tires, car audio systems),

(B)   alcohol, tobacco, and vapor products,

(C)   clothing (*e.g.*, Victoria's Secret; Old Navy, T.J. Maxx, H&M, Justice, etc.),

(D)   housing, groceries, and general household expenses (*e.g.*, rent, lawn care, etc.),

(E)   entertainment (*e.g.*, online dating services, Amazon Kindle books, Netflix, DirecTV, GameStop, Spotify, Redbox, iTunes, movie theater and sporting event tickets, etc.),

(F)   sporting goods, memorabilia, fantasy leagues, etc.,

(G)   personal grooming (*e.g.*, hair salons, tanning),

(H)   medical expenses, and

(I)   tuition and various expenditures for Tager's children (*e.g.*, a vehicle, school lunches, school pictures, sports camps and coaching, cheerleading/dance club, etc.).

<u>The Jersey Royalty Interest Agreements</u>

42.     Jersey and Tager produced, in connection with the offer and sale of Jersey securities, two related documents that served to memorialize each investor's investment in Jersey. These two documents are called the Royalty Interest Purchase Agreement and the Royalty Interest Payment Agreement.

43.     Royalty Interest Purchase Agreements served to record the investor's name, investment amount, promised investment return, and date of investment and acceptance by Jersey. The purchase agreements included a variation of terms promising at least a 100% return in one year or less to be paid from either "the soil remediation and refining operations of

[Jersey]" or "the mining operations of [Jersey]."

44.     Royalty Interest Payment Agreements reiterated the investor's name, date of investment, and investment return terms and set forth the various terms and representations governing the Royalty Interest investment, including that investors had the option of being repaid in gold, silver, platinum, or palladium and that "[t]o further secure and protect the Royalty Interest Owners [*i.e.*, the investors], [Jersey] pledges it's [*sic*] physical assets in the form of equipment valued at over $1,500,000[1] U.S.D[.] which are free of any Article 1 or Article 9 filings against them and the revenue stream that is currently being generated to the benefit of said Royalty Interest Owners who will be positioned in first place."

45.     The Royalty Interest documents were signed by Tager and Mangum on behalf of Jersey and as its principles.

46.     These two Royalty Interest documents contained misrepresentations and omissions in that:

(A) Jersey possessed no commercially viable soil remediation, refining, or mining operations from which to generate funds to repay investors the promised returns,

(B) Jersey was not producing gold, silver, platinum, or palladium in other than trace amounts that required substantial further refining,

(C) the value of Jersey's equipment, even if assumed to equal the stated amount, was dwarfed by the amount of funds Jersey raised from investors and thus provided little security, and

(D) Jersey had no material "revenue stream that is currently being generated."

<u>The Jersey Website</u>

47.     Jersey maintained a public website at www.jerseyconsultingllc.com.

---

[1] This figure changed over time and also included figures of $750,000 and $2,000,000.

48.     Images of the pages of this website captured on or about November 18, 2016, show multiple misrepresentations and omissions, including that:

(A)  Jersey's 80-acre "soil remediation claim" in or near the Arizona Strip contains at least 29,930 metric tons of "mineral rich ore" and that the "fundamental business purpose of [Jersey] is to mine its own claims" whereas, as mentioned previously, Jersey has no known claim,

(B)  Jersey's system "has now become an unusually high yielding and commercially successful system of precious metals extraction" whereas, in reality, Jersey's system has not proven commercially viable,

(C)  Jersey's "start-up phase concluded with [Jersey] becoming an operating company in 2013 generating revenues with its unique extraction methods developed by in-house scientists" whereas Jersey has never generated any material revenues from its ore extraction system, and Jersey is not known ever to have employed any in-house scientists,

(D)  Jersey "believe[s] and know[s] that your investment will be doubled with a twelve (12) month period or less" whereas there was no reasonable basis upon which to make this claim given Jersey's lack of commercial success,

(E)  Jersey's "proprietary process is being licensed to other mining companies in a manner that realizes significant additional revenues" whereas Jersey is not known to have ever entered into any licensing agreements that resulted in any material revenue to Jersey, and

(F)  Jersey's "skills are honed to the point where [r]esearch and [d]evelopment are not required; only adjustments to our process to fit other mining companies' specific needs and ore" whereas Jersey's system was never perfected or made commercially viable.

<u>Oral Statements to Investors</u>

49.      Mangum made multiple misrepresentations and omissions in connection with the offer, purchase, and sale of Jersey's Royalty Interest securities and obtained investor funds as a result of those statements.

50.      These misrepresentations and omissions, which Mangum made in oral statements to investors and prospective investors, included the following:

(A) Jersey owned mineral rights on BLM land on the Utah-Arizona border when Jersey possessed no such mining claims;

(B) Jersey's ore extraction process was successful when it was still in the development phase;

(C) Jersey had successfully commercialized its ore extraction process when it had only sold minimal amounts of precious materials; and

(D) Mangum was an expert in the industry and had a bachelor's degree in "electronics engineering" from the University of Utah when he was merely an amateur with no such degree.

51.      These statements were material, and they were made with a high degree of scienter.

52.      As a result of these personal meetings with Mangum and in reliance on the statements he made, investors made new and/or additional cash investments with Jersey.

53.      Mangum received significant personal and financial benefits as a result of his conduct with respect to Jersey. In additional to his weekly salary of up to $3,000 per week, Jersey purchased multiple vehicles for Mangum's personal use, paid the insurance premiums on those vehicles, paid the down payment on a personal residence for Mangum, paid the monthly payments on the personal residence, and employed several of Mangum's children (paying them at least $1,000 per week).

54.     In addition to these misrepresentations and omissions above, Jersey and Tager failed to disclose that Tager is a convicted felon, having pled guilty in 2005 to conspiracy to commit mail fraud, and spent 24 months incarcerated in federal prison.

55.     The misrepresentations and omissions described above would be material to a reasonable investor, and a reasonable investor would not have invested in or purchased Jersey securities had s/he known of them.

### Devices, Schemes, or Artifices to Defraud and Practices Operating as a Fraud

56.     In addition to its misrepresentation and omissions and the improper use of Jersey investor funds on personal expenditures, Jersey, Tager, and Mangum also engaged in other conduct in furtherance of their fraud. This conduct includes making Ponzi-type payments to some of the early Jersey investors with funds obtained from later investors, using testimonials received from some of the recipients to provide a false sense of security to later investors, making oral and written lulling statements to investors in order to reassure investors that their investments were safe and that payment was forthcoming, and providing tours of the Jersey facility and showing investors what they claimed was gold and silver in order to convince investors that Jersey's ore extraction process was successful.

### Ponzi-type Payments and Use of Testimonials

57.     Jersey and Tager represented that funds invested with Jersey would be used in connection with Jersey's ore extraction business and repaid from the revenues Jersey generated thereby.

58.     Because Jersey had no material revenue, Jersey and Tager, when repaying capital and returns to certain investors, necessarily used later investor funds to fund the distributions, contrary to representations made to Jersey investors.

59.     Jersey and Tager also obtained at least four written testimonials from Jersey

investors who received at least some repayment.

60.    Jersey, Tager, and the solicitors then distributed these testimonials to prospective investors to induce them into a false sense of security concerning the Jersey securities offering.

Lulling Statements

61.    From at least October 2014 through at least September 2017, Jersey and Tager produced and Jersey, Tager, and the solicitors disseminated a number of Jersey newsletters to both existing investors and prospective investors in Jersey securities.

62.    These newsletters purported to provide updates as to the progress and continual development of Jersey's ore extraction system and business but also contained material misstatements and omissions evidently designed to falsely lull investors into believing that their investments in Jersey were still on-track to perform.

63.    For example, in the February 2017 newsletter, Jersey states, among other things, that:

> In addition to our in-house production, we have secured an additional production contract with Commercial Metals Company (CMC), one of the largest metals producers in the country. [DISPLAYS CMC'S LOGO] Commercial Metals Company – CMC has agreed to smelt 300 to 500 tons of [Jersey's] material monthly. The upside is beyond substantial! The relationship between CMC and [Jersey] will dramatically and forever change the success and profitability of the company.

64.    This statement is false. When investigators contacted CMC, they were informed that CMC, a steel recycling company that produces products such as re-bar and steel fence posts, does not smelt materials, and that CMC is unfamiliar with and has no agreements with Jersey.

65.    In addition to newsletters, Jersey also disseminated at least one lulling letter to investors purporting to explain the substantial progress the company had been making and the reasons for Jersey's delay in repaying investors.

66.    This undated letter also lulled investors into a false sense of security about their Jersey investments by telling them that Jersey had "millions of dollars [*sic*] worth of raw end

product that has come through our process that has been stockpiled" and promising investors an additional 2% interest on their invested principal during Jersey's default.

67.    Jersey, Tager, and the solicitors also made oral statements to lull investors into a false sense of security about their Jersey investments by telling them that Jersey needed an extension to make the payments owed to investors because Jersey was starting to build its own refinery, was integrating refining into their own operation, and/or was working on the sale of its intellectual property to a variety of foreign investors.

<u>Tours of the Jersey Facility</u>

68.    Jersey, Tager, and Mangum invited investors and prospective investors to visit Jersey's facility in West Jordan, Utah. During these visits, investors and prospective investors would meet with Tager and Mangum to discuss the investment and to show them Jersey's operations.

69.    Tager and Mangum would discuss, *inter alia*, the "success" of Jersey's ore extraction process and technology, the amount of equipment owned by Jersey, the amount of material owned and processed by Jersey, and the qualifications of the people working at Jersey.

70.    Mangum would provide the investors and prospective investors with a tour of the facility. During these tours, Mangum would show the investors and prospective investors the operations of the plant, and at the end of the tour would bring out metal bars and ingots that he claimed were full of gold and silver. He told investors that these bars and ingots paid for all of Jersey's operations.

**<u>Scienter</u>**

71.    Tager and Mangum knew their representations were false and misleading at the time they made them because they were in possession of the true facts.

72.    Tager has been Jersey's sole owner and managing member since the time of its

inception and thus knew the truth about Jersey's business operations and finances.

73.     Tager possessed ultimate authority over the content of Jersey's written communications, which he provided to the solicitors for their use in soliciting investors.

74.     Tager established and controlled Jersey's bank accounts, including the granting of authorized signer status to others on some of Jersey's accounts. Tager directed all financial and operational aspects of Jersey and handled and directed investor funds.

75.     Tager knew that investors were not being repaid as promised or were being repaid from new investor funds.

76.     Tager and Mangum knew that Jersey had no mining or mineral claims of its own and was not generating any material revenues from its commercially unsuccessful system.

77.     Magnum knew that Jersey's ore extraction process had not been successful in producing any significant amounts of gold, silver, platinum, or palladium.

78.     Mangum knew that he did not have the credentials that Jersey, Tager, and he claimed to have.

79.     Tager and Mangum knew that investor funds were being used for a variety of personal expenses by Tager, Mangum, Freitas and others.

80.     As the sole owner and operator of Jersey, Tager's scienter is imputed to the company.

## UNREGISTERED OFFER AND SALE

81.     No registration statement has been filed with the Commission as to any offering of securities by Jersey.

82.     Jersey, Tager, Mangum, and solicitors Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken engaged in a general solicitation of Jersey securities.

83.     Jersey, Tager, Mangum, and solicitors Gagnier, K. Gross, Lebarton, J. Shoucair,

18

Goss, Harrloe, and Mandracken sold Jersey securities to investors who were not accredited investors, as defined in Rule 501(a) of Regulation D [17 C.F.R. § 230.501(a)], and did not take reasonable steps to verify that investors were accredited.

## UNREGISTERED BROKER ACTIVITY

84.     Solicitors Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken are not and were neither registered with the Commission as brokers nor associated with entities that were registered with the Commission as brokers during the period of their solicitation of Jersey securities.

85.     Solicitors Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken are or were acting as brokers in connection with the offer and sale of Jersey securities by actively soliciting investors on behalf of Jersey.

86.     Solicitors Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken directly or indirectly, received transaction-based compensation (*i.e.*, commissions) of 20-30% arising from investor purchases of Jersey securities.

### FIRST CAUSE OF ACTION
### OFFER AND SALE OF UNREGISTERED SECURITIES
### Violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]
### All Defendants

87.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

88.     Defendants Jersey, Tager, Mangum, Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, or carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

89.     No registration statement has been filed with the Commission or has been in effect with respect to these securities.

90.     By reason of the foregoing, defendants Jersey, Tager, Mangum, Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, directly or indirectly violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**SECOND CAUSE OF ACTION**
**AIDING AND ABETTING**
**Violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]**
**All Individual Defendants**

91.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

92.     By engaging in the conduct described above, defendant Jersey violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)], and defendants Tager, Mangum, Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, knowingly or recklessly, provided substantial assistance to Jersey in its achievement of said violations.

93.     Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Securities Act, or of any rule or regulation issued under the Securities Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

94.     By reason of the foregoing, and in the alternative to their direct violations of Sections 5(a) and 5(c) of the Securities Act as described above, defendants Tager, Mangum, Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, is liable for violations of Sections 5(a) and 5(c) of the Securities Act to the same extent as

20

defendant Jersey is liable and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act.

### THIRD CAUSE OF ACTION
### FRAUD IN CONNECTION WITH THE OFFER AND SALE OF SECURITIES
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### Defendants Jersey, Tager, and Mangum

95.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

96.     Defendants Jersey, Tager, and Mangum, and each of them, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, (1) employed a device, scheme, or artifice to defraud, (2) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser. By reason of the foregoing, defendants Tager, Mangum, and Jersey, and each of them, directly or indirectly, violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15U.S.C. § 77q(a)].

### FOURTH CAUSE OF ACTION AIDING AND ABETTING
### Violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### All Individual Defendants

97.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

98.     By engaging in the conduct described above, defendant Jersey violated Section 17(a) of the Securities Act, and defendants Tager and Mangum, knowingly or recklessly,

provided substantial assistance to Jersey in its achievement of said violations.

99.     By engaging in the conduct described above, defendant Jersey violated Section 17(a)(2) of the Securities Act, and defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, knowingly or recklessly, provided substantial assistance to Jersey in its achievement of said violations.

100.     Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Securities Act, or of any rule or regulation issued under the Securities Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

101.     By reason of the foregoing, and in the alternative to his direct violations of Section 17(a) of the Securities Act as described above, defendants Tager and Mangum are liable for violations of Section 17(a) of the Securities Act to the same extent as defendant Jersey is liable and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

102.     By reason of the foregoing, defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, is liable for violations of Section 17(a)(2) of the Securities Act to the same extent as defendant Jersey is liable and, unless enjoined, will each continue to violate Section 17(a)(2) of the Securities Act.

### FIFTH CAUSE OF ACTION
### FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5]
### Defendants Jersey, Tager, and Mangum

103.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

104.     Defendants Tager, Mangum, and Jersey, and each of them, by engaging in the

conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; and/or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

105.    By reason of the foregoing, defendants Tager, Mangum, and Jersey, and each of them, violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. §240.10b–5].

**SIXTH CAUSE OF ACTION**
**AIDING AND ABETTING**
**Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5]**
**All Individual Defendants**

106.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

107.    By engaging in the conduct described above, defendant Jersey violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5, and defendants Tager and Mangum, knowingly or recklessly, provided substantial assistance to Jersey in its achievement of said violations.

108.    By engaging in the conduct described above, defendant Jersey violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5(b), and defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, knowingly or recklessly, provided substantial assistance to Jersey in its achievement of said violations.

109.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a

provision of the Exchange Act, or of any rule or regulation issued under the Exchange Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

110.     By reason of the foregoing, and in the alternative to his direct violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5 as described above, defendant Tager is liable for violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5 to the same extent as defendant Jersey is liable and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5.

111.     By reason of the foregoing, defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, is liable for violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5(b) to the same extent as defendant Jersey is liable and, unless enjoined, will each continue to violate Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5(b).

## SEVENTH CAUSE OF ACTION
### OFFER AND SALE OF SECURITIES BY AN UNREGISTERED BROKER OR DEALER
### Violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]
### Defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken

112.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

113.     Defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker- dealer registered with the Commission.

114.     By reason of the foregoing, defendants Gagnier, K. Gross, Lebarton, J. Shoucair,

Goss, Harrloe, and Mandracken violated and, unless restrained and enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. 78o(a)(1)].

**EIGHTH CAUSE OF ACTION**
**AIDING AND ABETTING**
**Violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**
**Defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and**
**Mandracken**

115.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

116.     By engaging in the conduct described above, defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken violated Section 15(a)(1) of the Exchange Act, and defendants Jersey and Tager, knowingly or recklessly, each provided substantial assistance to defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken in their respective achievement of said violation.

117.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Exchange Act, or of any rule or regulation issued under the Exchange Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

118.     By reason of the foregoing, defendants Jersey, Tager, and Mangum are each liable for violations of Section 15(a)(1) of the Exchange Act to the same extent as defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken are liable and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act.

**NINTH CAUSE OF ACTION**
**VIOLATION OF ASSOCIATIONAL BAR THROUGH ACTING AS A BROKER**
**Violation of Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(b)(6)(B)(i)]**
**Defendant K. Gross**

119.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

120.     Defendant K. Gross, who has previously been made the subject of a Commission bar from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical ratings organization and from participating in an offering of penny stock, with such previous bar being in effect, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker-dealer registered with the Commission (*i.e.*, acted as a broker).

121.     By reason of the foregoing, defendant K. Gross violated and, unless restrained and enjoined, will continue to violate Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. 78o(b)(6)(B)(i)].

## TENTH CAUSE OF ACTION
## RECEIPT OF ILL-GOTTEN GAINS
### Relief Defendants Premier Marketing Solutions, Inc., Equity First Properties, Inc., Eee Media, Inc., XYZ Leads, Inc., U Turn Marketing, Freitas, R. Gross, Mangum, and C. Shoucair

122.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 86, above.

123.     Relief defendants Premier Marketing Solutions, Inc., Equity First Properties Inc., Eee Media, Inc., XYZ Leads, Inc., U Turn Marketing, Inc., Matthew Jacob Freitas, Roxane Marie Gross, Matthew Earl Mangum, and Christine L. Shoucair each had some connection with the activities that are the subject of this complaint.

124.     Through these activities, each of relief defendants Matthew Jacob Freitas and Matthew Earl Mangum received, directly or indirectly, ill-gotten funds belonging to Jersey and

obtained by it in connection with the illegal offer and sale of Jersey securities to investors.

125.    Through these activities, each of relief defendants Premier Marketing Solutions, Inc., Equity First Properties Inc., Eee Media, Inc., XYZ Leads, Inc., U Turn Marketing, Inc., Roxane Marie Gross, and Christine L. Shoucair received ill- gotten funds due and owing to certain solicitors from Jersey and Tager in connection with the illegal offer and sale of Jersey securities to investors.

126.    Relief defendants Premier Marketing Solutions, Inc., Equity First Properties Inc., Eee Media Inc., XYZ Leads, Inc., U Turn Marketing, Inc., Roxane Marie Gross, and Christine L. Shoucair do not have legitimate claims to some or all of the funds they received from or because of Jersey or Tager and arising from Jersey's and Tager's illegal activities in connection with its illegal offer and sale of Jersey securities to investors.

127.    By reason of the foregoing, each of relief defendants Matthew Jacob Freitas and Matthew Earl Mangum should be required to disgorge funds belonging to Jersey that were improperly obtained, directly or indirectly, by and/or for the benefit of each of them.

128.    By reason of the foregoing, each of relief defendants Premier Marketing Solutions, Inc., Equity First Properties Inc., Eee Media Inc., XYZ Leads, Inc., U Turn Marketing, Inc., Roxane Marie Gross, and Christine L. Shoucair should be required to disgorge the proceeds of any commissions, bonuses, and/or fees obtained through or in connection with the illegal offer and sale of Jersey securities to investors.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I

Issue findings of fact and conclusions of law that the defendants committed the violations charged herein.

## II

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that temporarily, preliminarily, and permanently enjoin defendants Tager, Jersey, and Mangum, and each of them, and their respective officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from (A) engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Sections 5 and 17(a) of the Securities Act, Sections 10(b) and 15(a)(1) of the Exchange Act, and Exchange Act Rule 10b–5, (B) transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets, claims, or other property or assets owned or controlled by, or in the possession or custody of, defendants Jersey and Tager respectively; and, (C) transferring, assigning, selling, hypothecating, or otherwise disposing of any assets of Jersey.

## III

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that temporarily, preliminarily, and permanently enjoin defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, and their respective officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from (A) engaging in transactions, acts, practices, and courses of business described herein and from engaging in conduct of similar purport and object in violation of Sections 5 and 17(a)(2) of the Securities Act, Sections 10(b) and 15(a)(1) of the Exchange Act, and Exchange Act Rule 10b–5(b), (B) transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets,

claims, or other property or assets owned or controlled by, or in the possession or custody of defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, respectively; and, (C) transferring, assigning, selling, hypothecating, or otherwise disposing of any assets of Jersey.

## IV

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, an order that temporarily, preliminarily, and permanently enjoins defendant K. Gross and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business in violation of Section 15(b)(6)(B)(i) of the Exchange Act.

## V

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminarily, and permanently restrain and enjoin the defendants and the relief defendants, and each of them, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, books, records, computer programs, computer files, computer printouts, correspondence, including e-mail, whether stored electronically or in hard copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of defendant Jersey.

## VI

Enter an order directing defendants, and each of them, to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## VII

Enter an order directing each defendant and each relief defendant to disgorge all ill-gotten gains received during the period of violative conduct and to pay prejudgment interest on such ill-gotten gains.

## VIII

Enter an order permanently enjoining defendant Tager from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

## IX

Enter an order permanently enjoining defendants Gagnier, K. Gross, Lebarton, J. Shoucair, Goss, Harrloe, and Mandracken, and each of them, from directly or indirectly, including, but not limited to, through any entity owned or controlled by each, soliciting any person or entity to purchase or sell any security.

## X

Grant such further equitable relief as this Court deems just, appropriate, and necessary, including, but not limited to, a freeze of assets, the appointment of a receiver, an accounting, and accelerated discovery.

## XI

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated August 14, 2018.

                                        Respectfully submitted,

                                          _____

                                          Amy J. Oliver
                                          Daniel J. Wadley
                                          Attorneys for Plaintiff
                                          Securities and Exchange Commission